**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 31 2016

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

Shirley CURD and
David BRENNAN,

                     Plaintiffs

    vs.

CITY OF SEARCY, ARKANSAS,

                     Defendant

Civil Action, Case No. 4:16cv632-BRW

This case assigned to District Judge _Wilson_
and to Magistrate Judge _Harris_

**VERIFIED COMPLAINT**

**I**
**PARTIES**

**Plaintiff #1:**      Shirley Curd

                     1200 Curd Drive

                     Searcy, AR 72143

**Plaintiff #2:**      David Brennan

                     1200 Curd Drive, lot 4

                     Searcy, AR 72143

**Defendant:**      City of Searcy, Arkansas

                     401 West Arch

                     Searcy, AR 72143

**II**
**JURISDICTION**

The United States District Court has jurisdiction over this case pursuant to 28 USC §

1331 (federal question) and 42 USC § 1983 (violation of civil rights).  Plaintiffs are citizens of

the united States of America and residents of the State of Arkansas.  The City of Searcy,

1

Arkansas is is a city within the State of Arkansas.

III

VENUE

All parties residing in or being located in White County, Arkansas, venue in the Eastern

District of Arkansas, Western Division is proper.

IV

BASIS OF COMPLAINT

**History**

1.      In 1968 and 1969, the late Vernon Curd, who was the father of Plaintiff Curd and

the grandfather of Plaintiff Brennan, together with his wife Maxine, established a homestead just

outside of the City of Searcy.  They purchased two adjoining parcels of land which they

thereafter used as a single property.  The current address of this property is 1200 Curd Drive,

Searcy, Arkansas, 72143. The legal description of the property, which has been combined into

one parcel via correction deed, is

> A part of the West 15.00 acres of the Southwest Quarter (SW ¼) of the Northwest
> Quarter (NW ¼) of Section 3, Township 7 North, Range 7 West, more particularly
> described as follows: Beginning at a point 105 feet West of the Southeast Corner
> of the West 15.00 acres of the SW ¼ of the NW ¼ and running North 840 feet;
> thence South 68° West 225 feet; thence South 505 feet to a point 115 feet East and
> 260 feet North of the Southwest Corner of the SW ¼ of the NW ¼; thence East
> 110 feet; thence South 260 feet; thence East 105 feet to the point of beginning,
> containing 3.32 acres, more or less.

2.      In 1971 and 1972, Vernon Curd laid out and substantially constructed the subject

property into a mixed-use development/subdivision for both site-built single family efficiency

homes and mobile homes.  This included the construction of 15 terraced lots and one additional

lot suitable for the construction of efficiency homes or the placement of mobile homes, a gravel

drive, concrete parking, grading, storm drains, and water, sewer, gas, electric, and telephone

facilities.

2

3.     The subject property was annexed by popular vote into the City of Searcy in 1972. At the time of annexation, the property was a mixed-use development/subdivision entitled under the Zoning Code to continue as a nonconforming property and use.

4.     The property has never been sold off in parcels and has always functioned as a single property under the ownership of Vernon and Maxine Curd until its transfer to the Vernon L. and Maxine H. Curd Family Trust (the trust) in 2008.

5.     Historically, a rental property business known as Curd Trailer Park (later Curd Trailer & RV Park) owned by Vernon Curd and then Maxine Curd and Shirley Curd had been operated on the property managed by Plaintiff Curd and subsequently by Plaintiff Brennan.  In May 2016, the trust leased the subject property to Plaintiffs, who soon thereafter began to operate the rental property business known as NorthRidge Village on the property with Brennan acting as manager.  Curd and Brennan having lawful use and control of the subject property for the business they jointly operate upon it, they are the real parties in interest.

6.     The property has historically been treated by the city as a mixed-use development/subdivision, with the city allowing the continuance of the mobile home park as well as permitting the construction of site-built single family residential units on the property.

7.     At no time since its annexation has the property been used solely for site-built single-family residential units or solely as a mobile home park.  It has, at all times since annexation, maintained its mixed-use character and has expanded to 33 sites.  Three of the sites are occupied by site-built single-family residential units, and one is the site of the workshop, which was designed with living quarters in it.  12 sites make up the RV park portion of the property.  The construction of site-built single-family residential units has historically been permitted by the city.

3

8.     The character of the property has always been very rural.  Vernon Curd had a lifelong habit of maintaining piles of junk and debris as well as allowing overgrowth to some extent on the property.  As caretaker of the property since 2009, Brennan had cleaned it up considerably.  However, there were times when overgrowth was allowed to encroach before being cut back, and Brennan has a habit of collecting downed limbs and other wood debris in piles in various places on the property – sometimes for several months at a time - and then having bonfires as country people sometimes do.  Code Enforcement was well aware of these conditions and had never issued a warning regarding them.

9.     In the mid and late 1990s, Vernon Curd twice unsuccessfully sued the city in U.S. District Court to compel the city to extend sewer service to the subject property and for money damages for the city having not done so upon annexation.

10.     Since and because of this exercise of the constitutional right to petition, the city has carried a decades-long grudge, transcending administrations, against Vernon Curd and his family and their interests, which has manifested itself in the way the city has treated Mr. Curd and his family and interests.

(a)     The Searcy Police and the Searcy Municipal Court (now White County District Court, Searcy Division) have never interpreted the Arkansas landlord lien and abandonment statute (Ark. Code Ann. § 18-16-108) by its clear and unambiguous language.  The Searcy Police have repeatedly threatened Plaintiffs with arrest for exercising their landlord's lien.

(b)     The city has unsuccessfully prosecuted Mr. Curd and Plaintiff Curd for theft of property for exercising their rights under Ark. Code Ann. § 18-16-108 despite full knowledge that they had done nothing wrong.  When Vernon Curd and Plaintiff

4

Shirley Curd seized a mobile home valued at $3,000.00 which was legally abandoned under Ark. Code Ann. § 18-16-108,  the former owners unsuccessfully sought prosecution by the Prosecuting Attorney (at the time Chris Raff).  When the Prosecuting Attorney refused to prosecute the case due to the application of Ark. Code Ann. § 18-16-108, the former owners and City Attorney Buck Gibson misrepresented the value of the property as less than $500.00 in order to prosecute Vernon Curd and Plaintiff Shirley Curd for theft as a misdemeanor in Searcy Municipal Court.  Vernon Curd and Plaintiff Shirley Curd had instructed their attorney to attempt to prevail first on the application of Ark. Code Ann. § 18-16-108, but Municipal Judge Phil Shoffner stubbornly refused to apply the statute, spinning a false legal distinction between a lease and a month-to-month tenancy.  When it was clear that Judge Shoffner would not apply the statute, Plaintiff Brennan advised Counsel for Vernon Curd and Plaintiff Shirley Curd to get one of the former owners on the stand and ask if the mobile home that had been seized had been advertised by her for sale and for how much.  She had advertised it for sale for $3,000.00  When it became inescapable that the value was in excess of the $500.00 felony threshold at the time, Judge Shoffner reluctantly dismissed the case for lack of jurisdiction.  The Prosecuting Attorney refused to prosecute due to Ark. Code Ann. § 18-16-108.  The Curds chose not to sue for this unreasonable arrest and malicious prosecution for the sole reason that they did not want to be embroiled in another legal battle with the city.

(c)     The White County District Court, Searcy Division has completely ignored the same statute and issued a civil judgment in excess of $12,000.00 against Plaintiff Curd and the rental property business she and Maxine Curd operated and Plaintiff

Brennan managed on the property without a trial of the facts, prompting an unsuccessful attempt by Brennan to have Judge Mark Pate removed from office by the Arkansas Judicial Discipline and Disability Commission (JDDC). The judgment of the District Court was easily reversed on appeal to the Circuit Court. Judge Mark Pate, who Plaintiff Brennan had attempted to have removed from office, is the judge who signed the four arrest warrants which resulted in the arrests complained of herein.

11.     The rental property business on the property has been in steady decline for well over a decade, and the property has begun to become blighted. There has historically been a mix of rental mobile homes owned by the business and tenants who own their own mobile homes and rent the sites from the business. Since 2009, the business has not been able to generate enough revenue to properly maintain the property and the rental units. Even the newest and nicest mobile homes are difficult to rent, and the older, declining mobile homes are impossible to rent for enough to keep the business economically viable. For years, Maxine Curd and Plaintiff Curd had been looking into possible avenues for improving the property and making the business profitable, but the costs had always been too high to justify. In March 2016, Maxine Curd and Plaintiffs were very seriously seeking alternatives to make the property, which was operating on this declining basis, profitable and began looking for new and innovative ways to improve the property. Due to the expense of site-built construction, this option was early relegated to the last to be considered. As part of their larger plans, they began planning to demolish two mobile homes, one of which had been removed from rental service due to disrepair and used for storage and the other of which had extensive mold, and replace them with two two-story storage sheds. Plaintiff Brennan met with Defendant Cleveland to discuss the permitting. Cleveland told

6

Brennan that the two-story buildings could not be permitted as storage sheds. He also told Brennan that the two-story storage sheds could not be converted into residences, because the property could only be used as a mobile home park. This came as a surprise to Brennan, because the city and the family had always treated the property as a grandfathered mixed-use development/subdivision, and the city had permitted site-built single-family homes before.

12.      The idea of purchasing a number of two-story storage buildings and converting them into efficiency homes colloquially referred to as tiny homes for rental – arising from Brennan's discussion with Cleveland - appealed greatly to Maxine Curd and Plaintiffs. They took a closer look at the construction of the storage buildings and determined that they could be converted to tiny homes built better than the average house. They determined that renting fully furnished tiny homes with utilities paid could easily be a profitable venture. They already had one tiny home on the property which was rented on that basis, and, unlike the aging and increasingly dilapidated mobile homes, there had never been any trouble renting it at a profitable rate. The family compared the options of purchasing new mobile homes for rental, purchasing and remodeling older mobile homes for rental, and constructing two-story tiny homes for rental, and the tiny homes were the only option that would return a profit. This option would even generate enough revenue to make major improvements on the property and maintain the property and the tiny homes in top-notch condition. The decision was made to pursue this course of action in earnest.

13.      In resulting discussions with Cleveland and Code Enforcement Department employee Phil Watkins, Brennan pursued this course of action. Cleveland and Watkins advised Brennan that they felt the tiny home option could only be pursued as a Planned Development (PD) under the City of Searcy Zoning Code. Setting aside the fact that the subject property was

a mixed-use development/subdivision at the time of annexation and had since been treated as such by the city, the decision was made not to press the point at the moment, and Brennan evaluated the PD course of action and studied the Zoning Code as well. He soon came to the following conclusions:

(a)     Because the Zoning Code establishes the purposes of a PD as "to promote flexibility and innovation in the design of **large-scale developments** and to encourage the use of **vacant in-fill parcels** in the built up portion of the city" (City of Searcy Zoning Code at p.73, emphasis added) (attached as Plaintiffs' Exhibit 1), the 3.32 acre established mixed-use development at issue clearly did not qualify as either a large-scale development or a vacant in-fill parcel and therefore could not legally qualify as a PD.

(b)     Because of the small size of the property at issue, the PD's requirements of engineering drawings, paved roads, curbs, gutters, drainage, etc., would be cost-prohibitive. The economies of scale which enable large-scale developments to exist profitably could not be achieved on such a small property.

(c)     Even if Cleveland's insistence that only mobile homes could be placed on the property were to be accepted, all that was necessary for the tiny home course of action was a few simple variances. If the variance avenue was not available, the use could be accomplished by a determination as to use not listed and the grant of a conditional use.

(d)     Cleveland's insistence that only mobile homes could be placed on the property was not valid and should not be accepted, and all that was truly necessary to proceed was a formal determination that the property at issue was a legal nonconforming

8

development grandfathered in since annexation.  The property had historically been treated by the city as such, and the only reason a formal determination was necessary is that Cleveland would not issue construction permits.

14.     When he relayed these conclusions to Cleveland and Watkins, Brennan was told by Watkins that the issue was "not varianceable" and by Cleveland that the determination that the property was a legal nonconforming development grandfathered in since annexation was a matter for the planning commission.  He was also informed by Watkins that, if the budgets for plumbing and electric did not exceed $2,000 each per unit, he could do his own plumbing and electrical subject to city inspection. Brennan told Cleveland that he planned to seek a conditional use by applying to the Planning Commission but that he felt all that was necessary to move forward was for Cleveland to treat the property as a legal nonconforming development/subdivision entitled to continue with existing drives, drainage, utilities, lot sizes, and setbacks.  Cleveland told Brennan that was a matter which was "above his pay grade" and therefore an issue for the Planning Commission.  Brennan was strenuously encouraged by Cleveland and Watkins to wait and let the Code Enforcement Department mull things over and see what they felt was or was not possible before spending any money.  Confident in his understanding of the Zoning Code and extremely skeptical of the judgment of Cleveland and Watkins, Brennan secured the necessary application forms and instructions, anyway.

15.     Time was of the essence, because the family had applied for and been granted financing for this course of action, with the majority being on an interest only for six months basis. It would have been frivolous to seek any Planning Commission determination until the financing had been approved, and the approval was on a yes or no basis unlike the pre-approval process for a mortgage.  The clock was ticking on the six months interest only period, and

9

waiting on the Code Enforcement Department to advise him when they had already demonstrated a lack of understanding of the Zoning Code concerning a PD was ill-advised at best.

16. Brennan, acting at the time on behalf of the trust as its property manager, had complied with all of the Zoning Code's requirements for the application. On the deadline date to be placed on the May Planning Commission meeting agenda, Brennan delivered to the Code Enforcement Department a document entitled Application for Determination as to Legal Nonconforming Use – Alternatively for Determination As to Use Not Listed and for Conditional Use, together with the appropriate application forms and exhibits. This document is attached hereto, without exhibits, as Plaintiffs' Exhibit 2. The application was **first and foremost** one for a formal determination that the subject property is indeed a legal nonconforming development/subdivision entitled to continue with its current drives, drainage, lot sizes, and setbacks. It sought, **in the alternative**, a determination that the use sought was a conditional use not listed in the Zoning code and for a grant of the conditional use. Code Enforcement staff signed a receipt for Brennan's application but refused to file it and accept his filing fee. Watkins told Brennan that they would have to look at it and see if it was something that could even be done and that, if so, it would be filed, and he would be placed on the June Planning Commission meeting agenda. A heated conversation ensued, resulting in Watkins promising that, if this was something that could be done, the matter would be placed on the May Planning Commission meeting agenda.

17. Subsequently, several city officials visited the property, including the City Engineer, Cleveland, and the City Planner. During the visit by Cleveland and the City Planner, Cleveland observed that two lots were occupied by portable storage buildings which appeared to

10

be lived in.  He asked if they were being lived in, and Brennan explained that they were not

owned by him or the business but were rent-to-own buildings contracted by tenants who rented

the lots.  He explained he had a business to run, and that he had to rent the lots to whomever had

the money.  He stated that, if a tenant wanted to live in an unimproved portable storage building,

that was their choice, and any code issues were between the tenant and Code Enforcement.

Cleveland expressed official disapproval and later directed Brennan to remove the buildings.

Nobody from Code Enforcement ever contacted the tenants responsible for the buildings.

18.     It is against this backdrop that the activities which are the subject of this

complaint took place.

**Unreasonable Seizure / Taking Without Due Process of Law**

19.     After the passage of several days, Brennan went to the Code Enforcement

Department to check the status of the review of his application and see if he could pay his filing

fee and have it formally filed.  He was informed that his application would not be filed, and the

matter would not be placed on the agenda for the May Planning Commission Meeting or any

other Planning Commission meeting.  Cleveland told Brennan it was "not an issue for the

Planning Commission, and that he would get a letter explaining the city's position.  Brennan then

requested that Cleveland issue the construction permits for the tiny homes.  He refused, stating,

"It's a mobile home park."

20.     Brennan subsequently received a letter from City Attorney Buck Gibson in which

hypertechnical interpretations of the Zoning Code were used to justify refusing the application

for determination as to use not listed and for conditional use.  No mention of the application for

determination as to legal nonconforming use appeared in the letter, a copy of which is attached as

Plaintiffs' Exhibit 3.  The letter went on to accuse Plaintiffs of having a number of existing code

11

violations on the property and further stated that "[f]urther communication concerning the future of this property will only deal with addressing these violations." (Exhibit 3 at page 2)  The city has clearly dug in its heels and is not only refusing to consider proposed future uses of Plaintiffs' property but is also barring them from access to the process set up for such considerations.

21.     The closing sentence of that letter embodies and constitutes an unreasonable seizure and a taking or deprivation of the property at issue without due process of law in violation of rights secured by the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States of America.  The city has restricted the future use of the property of which Plaintiffs now have full use and and control for their rental property business to a single use which it is aware Plaintiffs cannot make profitable and barred them from the process which is due for the determination of uses of property – the Planning Commission process.  The denial of the prior use and the restriction of the use of the property to a single unprofitable use is so severe as to constitute a seizure and a taking or deprivation of the property.  The refusal to provide future access to the Planning Commission for the determination of future uses of the property, or even to communicate regarding such future uses, which is the crux of the City Attorney's letter is a blatant denial of due process of law.

22.     This is a clear denial of both procedural due process (the Planning Commission process) as well as substantive due process in that the actions of the city are wholly arbitrary, completely lacking in any rational relation to any legitimate governmental objective, and born of improper motives, namely punishment for the exercise of the right to petition and the furtherance of the city's decades-long grudge against and hostility toward Vernon Curd, his family, and their interests.  The actions of the city are steeped in a dislike for and an animosity toward the Curd family which was only intensified when, instead of just accepting the judgment of the Code

Enforcement Department, Brennan demonstrated that he was capable of reading and understanding the Zoning Code and seeing a different solution. This is born out by the subsequent behavior of city officials.

23.    While Brennan had been informed by Cleveland that the matter of a formal determination as to legal nonconforming use was "above his pay grade" and a matter for the Planning Commission, the City Attorney's letter made no mention of this aspect of Brennan's application. When Brennan confronted Gibson about this, he simply stated that "it's not a Planning Commission issue." Though Brennan was well aware that the Planning Commission is the entity set up by Arkansas law to handle such requests [Ark. Code Ann. § 14-56-411(2) and (3)], he decided to ask Gibson who in the city government is responsible for such a determination. Gibson said he could not tell Brennan, because to do so would constitute giving Brennan legal advice. So, it's a shameful and infantile game reminiscent of a kindergarten game of keep away and very unbecoming a city official. The Director of Code Enforcement, which is an arm of the Planning Commission, tells Brennan the determination is "above his pay grade" and therefore an issue for the Planning Commission, and the City Attorney says it's not a Planning Commission issue and that he can't tell Brennan which city department or official is responsible for making the decision, because it would be giving Brennan legal advice. Under that specious and ridiculous rationale, telling someone where to go to pay a parking ticket or apply for a variance or get a business license would constitute dispensing legal advice. When Brennan posed the question at City Hall, Gibson directed City staff to call the Searcy Police to have him removed, even though he had only been there a few minutes and was not causing a disturbance or being disorderly in any way. At least insofar as it concerns the family of Plaintiffs, there is no longer a citizen – public servant relationship in Searcy but only a ruler – subject relationship of

13

the type this country fought a war to be free from.

24.     As is demonstrated throughout this complaint, the city is playing fast and loose with the law in order to deprive Plaintiffs any profitable use of their property and treating Plaintiffs as second-class citizens or, more accurately, as subjects who dare bristle under the boot of absolute and unquestionable city rule. All actions complained of in this complaint were designed in significant part to punish Plaintiffs for the family exercising their constitutional right to petition both in Vernon Curd's 1990s federal lawsuits and in subsequent efforts.  Plaintiffs and their interests exercised these rights by seeking a Planning Commission hearing on the use of their land and its character as a legal nonconforming development/subdivision and by seeking an order from the Circuit compelling the City to place the matter on the Planning Commission agenda.[1]  Additionally, all actions complained of in this complaint were motivated by a significant degree by an institutional desire to put Plaintiffs in their place after they declined to follow the suggestions of Code Enforcement personnel as well as an intent to ruin Plaintiffs by restricting the use of their property to a single unprofitable use.

## Unreasonable Seizure / Unlawful Arrest Counts 1 and 2

25.     In April 2016 prior to the filing of his application, Brennan met with Cleveland to obtain a permit to demolish a mobile home.  Cleveland informed Brennan that no permit was necessary, as the City does not regulate mobile homes in any way – not their construction nor their demolition. This was a reiteration of a prior conversation Cleveland and Brennan had where Cleveland relayed to Brennan that a contractor named Steve Ghent was building a mobile home /

---

[1]   As property manager for the Vernon L. and Maxine H. Curd Family Trust, Brennan filed an action in White County Circuit Court seeking an order prohibiting the city from barring the matter from the Planning Commission.  The courts have traditionally allowed Brennan to appear and act, sue and be sued in the name of the business and property in his managerial capacity; however, the City Attorney pointed out that doing so on behalf of the trust is not provided for in Arkansas law, and it was agreed that the complaint should be stricken. The filing was nonetheless an exercise of the constitutional right to petition.

tiny home in Searcy and that there was nothing the Code Enforcement Department could do about it. Cleveland had said in that previous conversation that he had merely asked Ghent not to sell the tiny home to anyone inside the city limits. In the later conversation about the demolition, Brennan asked Cleveland if there was a time limit for the demolition operation, because Brennan had planned a "soft demolition" where he would salvage as much of the building material and fixtures as possible, and this would take time.  Cleveland did not give Brennan any time limit.

      26.    Brennan commenced the "soft demolition" salvage and demolition operation on or about April 12, 2015.  Some debris accumulated on the lot, while other debris was added to existing collection piles on other lots in preparation for bonfires to be had once the job was completed.  On May 17, 2015, Code Enforcement Officer Ken Shoemaker issued and mailed to the trust a warning / violation notice regarding the demolition and the debris piles which contained a blatantly false claim that the mobile home had been demolished and the debris left on the ground **for months**.  This is impossible, since Brennan had only commenced the demolition/salvage operation five weeks earlier.  The structure had not even been brought to the ground until May 1, and the City was fully aware that there was a lengthy salvage operation underway which had not commenced until April.  There is no way the debris could have been left on the ground for months, as the warning falsely stated.  Furthermore, there was never a period of longer than three days when Brennan was not actively working on the project.  The warning was issued in complete ignorance of what the Code Enforcement Department knew well to be the facts and flew in the face of what Cleveland had told Brennan about there being no time limit.  The warning gave a time of seven days to clear the lot and the other debris piles or be cited and possibly have the city clean up the lot and bill the trust for the work.  The warning did not state that anyone could possibly be subject to arrest for noncompliance with the warning.

15

27.     There was no way Brennan could complete the salvage/demolition operation in the seven day time limit specified in the warning.  This is partially due to the time-consuming nature of a salvage operation and partly due to the fact that Shoemaker had issued the same day another warning regarding vegetation growth on the property, and Brennan had to remedy the vegetation growth.  Also, neither Brennan nor Curd was going to let the city push them and their family around with trumped up and wholly unreasonable enforcement actions.  Cleaning up the debris piles at this point was pointless, as they were constantly being added to due to the ongoing demolition/salvage operation.  The warning was not complied with, and Brennan never contacted Code Enforcement regarding the matter.  The city was clearly being unreasonable, and if they wanted to prosecute them on this trumped up charge, Curd and Brennan would give them enough rope to hang themselves with rather than attempt the impossible task of clearing the debris in seven days, fail, and be prosecuted anyway.

28.     Under the City of Searcy Code of Ordinances, violation of the property maintenance ordinance is a **fine-only** violation.  One cannot possibly be jailed for simply violating the ordinance.

29.     Rather than issue a citation as he had clear authority to do, Shoemaker filed an affidavit for warrant of arrest seeking the arrest of both Plaintiffs herein.  In the affidavit, Shoemaker conveniently omitted the critical facts that Brennan had cleared the demolition/salvage operation with the Code Enforcement Department prior to commencing it, had been given no time limit for the work by the Director, and was using the debris piles on the other lots for debris from this mobile home.  The affidavit was purposefully crafted to result in the arrest of Plaintiffs where, had the full story been told, it would have been clear there was no probable cause to believe a violation had occurred.

16

30.     Plaintiffs were indeed subjected to custodial arrest on the charge of violating the city's property maintenance ordinance by the Searcy Police.  Ironically, by the time of the arrest, all debris had been cleared.  The arresting officers were instructed to pick Plaintiffs up and take them in to the White County Detention Center for booking and to be held until they posted the required bond.  On June 17, 2016, while in West Memphis, Arkansas, Brennan received phone calls from tenants on the property stating that the Searcy Police were on the property looking to arrest him.  Not finding Brennan at home, the officers proceeded to Curd's residence and informed her that they had a warrant for her arrest and had orders to take her in.  At the time, Curd was the only caregiver for her 88-year-old ailing mother and could not leave her.  She explained this fact to the officers.  In fact, she had to explain it more than once before the officers reluctantly agreed to contact the judge and see if they might not have to take her in.  They required Curd to keep her door open and stay in their sight until they could determine what to do about Curd, who could not possibly leave her mother.  The officers clearly had the orders and the intent and purpose to take both Plaintiffs to jail and hold them there until they posted bond for a violation they could never be jailed for even if convicted.  After contacting the judge, the officers read Curd the warrant, issued her a citation, and released her on her own recognizance.  Brennan canceled his plans for the day, returned to town, and voluntarily appeared for his arrest at the Searcy Police Department, where he was required to post $250 bond or be jailed.  He was issued a citation and released after posting his $250 bond in cash.  These arrests were unreasonable on the following grounds:

(a)     There was no probable cause to believe a violation had occurred.  The affidavit for the warrant (Exhibit 4) was deliberately crafted to leave out critical facts which made clear there was no probable cause and to portray a false

17

situation.  The warning and the affidavit falsely lead a judge to believe that the
debris had been on the ground for much longer than it actually had, and they
portray a static situation of debris just being left on the ground instead of an
ongoing demolition/salvage operation which had been cleared with the Code
Enforcement Department and had not been time-limited.  The warrants were the
product of clear official misconduct on the part of the Code Enforcement
Department.

(b)      Even if there had been probable cause, any finding of probable cause was
necessarily based on evidence produced by unreasonable searches.  The Code of
Ordinances makes it clear that code enforcement officers are subject to the
Constitution's warrant requirement just as police officers are.  The subject
property is private property with a privately maintained drive which has never
been dedicated to the city.  The property policy has always been that it is private
property not dedicated to public use in any way.  The property has been open to
tenants and their guests and those making deliveries or conducting maintenance
but closed to the public.  It is for this reason that tenants have never been allowed
to conduct yard sales except on the public street frontage.  The property has a
single entrance and exit and is well screened off from the public street.  It is not
and has never been open to the public or dedicated to public use as would be an
apartment complex or shopping mall.  Any search for evidence of violations
conducted on the property beyond the public street therefore requires a warrant.

(c)      Judge Mark Pate, who, given the recent attempt by Brennan to have him
removed from office by the JDDC, was prohibited from signing the warrants by

18

the Code of Judicial Conduct and was required to refer the matter to another judge, instead signed the warrants for the arrest of both Plaintiffs.  Canon 1, Rule 1.2 of the Arkansas Code of Judicial Conduct states: "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."  Any judge with a brain in his head would remember the name of the person who had recently tried to have him removed from office, and it inescapably appears improper for the judge to sign off on warrants for the arrest of that person and a family member.  Any reasonable judge would know this and would be aware of how a reasonable observer would see the situation.  The warrants themselves were the product of clear judicial misconduct, and the arrests were therefore unreasonable.

(d)      Even if probable cause had existed, the custodial arrests of Plaintiffs on charges so minor and insignificant and to which no jail time could ever attach even if Plaintiffs were to be convicted were patently unreasonable.  Code Enforcement Officers have express authority to issue citations, and a citation as opposed to a custodial arrest is what is required by the circumstances.  This is not a case of a police officer witnessing a violation and making a warrantless arrest for the violation.  The arrests were the result of a conscious and deliberate purpose to cause Plaintiffs as much trouble as possible and cost them as much money as possible to punish them for having the audacity - the gall - to insist on their property and due process rights, to further the city's long-standing grudge and animosity and the policy of pursuing that grudge and animosity as well as a new

19

official policy – apparently beginning with Plaintiffs - of effecting custodial arrests of persons accused of fine-only violations of the property maintenance ordinance or the Zoning Code. There is no legitimate governmental interest in effecting a custodial arrest for these alleged violations that isn't served equally well by the issuance of a citation. There is no legitimate governmental interest in effecting custodial arrests for such minor alleged violations which outweighs a citizen's interest in his Fourth Amendment right to be free from unreasonable seizures. When a person cannot be jailed even if convicted, it is unreasonable to arrest them and make them pay bail or be thrown in jail before they are even tried.

**Unreasonable Seizure / Unlawful Arrest – Counts 2 and 3**

31.   Because the city had refused to give Plaintiffs access to the Planning Commission process and refused to issue construction permits for the two-story tiny homes, and Plaintiffs had already secured financing for the improvement to their property, they were left in a scramble to figure out a way to improve their property in a manner that would be profitable. It was clear that they would not be allowed to place anything on their property except mobile homes without a lengthy and costly court battle. Before the initial warning regarding the debris which precipitated the arrests complained of in the previous counts, Plaintiff's investigated their options, including the possibility of purchasing tiny homes constructed in Mountain View, Arkansas on trailer chassis and which could be delivered to the property on wheels. The cost proved to be prohibitive. They turned their attention again to the Zoning Code. They found that portable storage buildings, built out into tiny homes and delivered to their final sites of occupancy as complete living units qualified as mobile homes under the definition of *mobile home* in the Zoning Code. That definition, at page 10 of the Zoning Code, a copy of which is

20

attached as Plaintiffs' Exhibit 5, is as follows:

> A single-family living unit designed for transportation after fabrication on streets and highways on its own wheels, or on flatbeds or other trailers, and arriving at the site where it is to be occupied as a living unit complete and ready for occupancy, except for main and incidental unpacking and assembly operations, located on jacks or permanent foundation, connected to utilities and erected in accordance with prevailing city laws.

> A dwelling unit constructed in a factory before the enactment of the federal standards.

32.    Plaintiffs remembered Brennan's prior conversation with Cleveland where Cleveland insisted that the city does not regulate the construction of mobile homes at all. Cleveland had explained the policy in his reasoning why the city could do nothing about Steve Ghent building his tiny home on wheels inside the city limits.  Based on that policy conveyed to Brennan by Cleveland, together with the definition of *mobile home* in the Zoning Code, Plaintiffs elected to order seven portable buildings of very high quality construction, have them placed on empty lots on their property, build them out into complete living units designed to be transported on trailers, and have them delivered to the lots where they would be occupied as complete living units.

33.    When Cleveland visited the property to conduct a warrantless search for evidence of violations and saw the first two units delivered, he demonstrated how unaware he was of the definition of *mobile home* in the Zoning Code by telling Brennan a mobile home had to have wheels.  Having a sense of humor, Brennan promptly went to the hardware store and purchased lawnmower wheels and casters and nailed them to the two units, just to demonstrate to Cleveland the absurdity of his position.

34.    Cleveland subsequently delivered a "stop work order" to Brennan along with a letter accusing Plaintiffs of building site-built homes without a permit and directing that the units

21

be removed within seven days. The letter also demanded the removal in seven days of the two rent-to-own buildings **contracted by tenants** that Cleveland had complained of before. Brennan had complied as much as he could with Cleveland's prior complaint and evicted the tenants, but the rent-to-own company had not collected the buildings yet. He could not have legally removed the buildings, because they were the property of the rent-to-own company. He could not seize them and remove them under his landlord's lien, because the rent-to-own company has a purchase money security interest in the building which supersedes a landlord's lien under Arkansas law. The letter delivered by Cleveland stated that the new units had to be removed because the property could only be used as a mobile home park, and the units were not mobile homes. Cleveland and the city purport to hold the second separate definition of *mobile home* in the Zoning Code to render the first completely null and void. The city's position is that only dwelling units built in a factory prior to the enactment of the federal standards qualify as mobile homes.

35.    Plaintiffs know enough about law and the rules of statutory interpretation to know that the city's position is invalid, in that it would render the entire first definition of *mobile home* meaningless and superfluous. This is another example of the city playing fast and loose with the law and its own zoning code to achieve a desired result rather than simply applying the law and the Zoning Code in accordance with the rules of statutory interpretation. Cleveland's position had obviously been formulated by someone else and given to him, since, just a few days earlier, he had been so ignorant as to the definition of *mobile home* that he thought it hinged on wheels.

36.    Plaintiffs did not comply with the stop work order or the warning letter. They felt that, as citizens rather than subjects who were presumed innocent until proven guilty and who are entitled to due process before their property rights could be diminished, they were not required to

22

comply. They would comply only once due process had run its course.

37.    The city again chose to effect custodial arrests. Though they have clear authority to issue citations, they chose instead to effect custodial arrests for trumped up violations of city ordinances and the Zoning Code.

38.    A police officer came to the property with instructions to take Plaintiffs to the Detention Center and book them in where they would be held until they could post bond. The officer had known Plaintiffs for over a decade and allowed them to arrange for bond and come to the Police Station and take care of the matter there. Still, had Plaintiffs not arranged for bond, they would have been jailed for these very, very minor, fine-only alleged ordinance and zoning code violations. The fact that they were allowed to voluntarily appear makes the arrests no less custodial. They were still in the custody of the police and were still required to post bond or be jailed.

39.    The second arrest of Plaintiffs constitutes an unreasonable seizure of each of the Plaintiffs on the following grounds:

(a)    The "evidence" was obtained by illegally searching Plaintiffs' private property as set out in paragraph 30(b) above.

(b)    The warrants were issued as a result of judicial misconduct as described in paragraph 30(c) above.

(c)    The custodial arrest of plaintiffs for such minor fine-only alleged violations, as the product of the supposedly deliberative warrant process and where there is no legitimate governmental objective that is greater served by a custodial arrest than it is by a citation and where the only plausible purposes of the custodial arrests are to punish Plaintiffs for presuming to differ with the Code Enforcement Department and

23

to further what can only be described as a fascist approach to municipal land use
regulation.

**Selective Prosecution**

40.    The Code Enforcement Department has a policy, tradition, practice, or custom of
lax enforcement.  As stated previously, the property at issue has almost continuously had
overgrowth and piles of junk or debris – often very significant overgrowth and junk/debris piles
– since before its annexation in in 1972.  Not once in those 43+ years has the Code Enforcement
Department initiated enforcement action for overgrowth or junk/debris piles.  Never.  There were
many times during that period that the overgrowth and the junk/debris piles were far, far worse
than any conditions on the property in the last year.  When a mobile home on the property
burned, it took  Plaintiffs well over a year to remove all the debris.  During this time, the Code
Enforcement Department made more than one visit to the property, and no enforcement action
was ever instituted.  In addition, numerous such violations have been allowed to exist on a
continuous basis on the only other property in Searcy with a sizable mobile home park on it.
Plaintiffs have documented these continuing violations at the property known as Taylor's Trailer
Park, which even include overgrowth right up to the back side of the mobile home nearly as high
as the roof of the mobile home, a non-running vehicle swallowed up in overgrowth, and
hundreds of feet of heavily overgrown and extremely unsightly fence line. These are violations
which have obviously been allowed to continue for years.  Plaintiffs have documented numerous
other egregious violations of the property maintenance ordinance which have been allowed to
continue for months and even years within the city limits.  Plaintiffs' Exhibit 6 contains historical
photos of the subject property to show the conditions that have been permitted to exist since
annexation, and Plaintiffs' Exhibit 7 contains photos of long-standing violations of the property

24

maintenance ordinance at other places in the city.  These photos demonstrate the policy, tradition, and practice of laxity of enforcement on the part of the Code Enforcement Department.

41.     On May 17, 2016, the Code Enforcement Department issued a warning regarding overgrowth on the property together with the warning on the demolition of the mobile home which precipitated Plaintiffs' arrest.  The enforcement actions, as well as all other enforcement actions complained of herein, were born of improper motives.  They are arbitrary actions taken with the purpose to single Plaintiffs out and subject them to enforcement action others similarly situated are not subjected to and punish them for exercising their constitutional right to petition and for having the intelligence and the independence of mind to insist on full realization of their property rights under the Constitution and the Zoning Code.

42.     The Code Enforcement Department having allowed overgrowth and debris piles on the property for 43+ years without enforcement action and having allowed numerous egregious and very obvious and unsightly violations to continue within the city limits for months and years as documented by Plaintiffs, the sudden enforcement actions against Plaintiffs but not others similarly situated (Taylor's Trailer Park and numerous other properties with months or years of overgrowth) **only after** Plaintiffs insisted on their full property rights are clearly a response to Plaintiffs advocating forcefully for their property rights.  Again, this is the city putting Plaintiffs in their place and making sure they understand their position in the ruler - subject relationship the city has established.

43.     These actions, being wholly arbitrary and capricious, not being rationally related to any legitimate governmental objective, and being carried out with the purposes of punishing Plaintiffs for exercising their Constitutional rights and of cementing a ruler - subject relationship rather than a citizen – public servant relationship are completely lacking of substantive due

25

process and plainly inconsistent with the principles of limited government upon which this country was founded. The only objective being served here is the sudden draconian enforcement of the Code of Ordinances and the Zoning Code, at least with respect to Plaintiffs, that is inconsistent with publicly stated city policy.

**Violation of Public Policy**

44.     The actions of the city in adamantly refusing to acknowledge the subject property as a legal nonconforming development/subdivision as it has historically been treated and refusing to consider any future use of the subject property other than as a mobile home park fly in the face of established public policy.

45.     The City's actions could only result in the continued blighting of the property, prevent the construction of new, safe, and attractive homes, and prevent the addition of workforce and young graduate housing. Additionally, they are taken not from a position of working with the people for the improvement of the city but from the position of absolute, inflexible, and draconian government rule.

46.     On the Code enforcement Department's Internet home page (http://www.searcy.com/city/code-enf/home-page), the following mission statement is given: "[t]o work in partnership with the people of Searcy to promote and maintain a safe and desirable living and working environment through a proactive effort in the enforcement of laws, regulations, codes and ordinances that help to improve the quality of life for all its citizens." There has been no working in partnership or any spirit of cooperation. There has only been an arrogant and unbending authoritarian attitude. The interpretations and suggestions of the Code Enforcement Department are to be unquestioningly accepted, and they are not open to hearing Plaintiffs out on their interpretations and suggestions. There was no working in partnership to

26

find a way forward to improve the quality of life for residents on the property.  There was only a "you do it our way or no way at all" approach.  The city is not only **preventing** the improvement of the quality of life for residents of the property but is deliberately ensuring that the quality of life on the property continues to decline.

47.     At page 3 of the Searcy, Arkansas Comprehensive Plan (Exhibit 8), the city recognizes the need for greater diversification of the housing market and lists a number of objectives for land use in the city.  Among those are:

(a)     "To be responsive to need (sic) development needs of Searcy's growing economy"

(b)     "To provide 'workforce' and 'young graduate' housing"

(c)     "To promote infill development and regeneration of blighted areas"

48.     The city's blatant refusal to work with Plaintiffs and its hell-bent determination that the property can only be used as a mobile home park despite its clear character as a  legal nonconforming development/subdivision is conspicuously inconsistent with the above policy considerations.  The city's actions can only serve to prevent rather than promote greater diversification of the housing market, ignore new development needs, prevent the construction of workforce and young graduate housing, and ensure the continued blighting of the subject property rather than its regeneration.  The city has violated its own public policy in its bull-headed and mean-spirited treatment of Plaintiffs.

**<u>Unreasonable Searches</u>**

49.     On at least four occasions, the Code Enforcement Department has conducted warrantless searches for violations on the subject property, violating Plaintiffs' right to be free from unreasonable searches.  On the last known warrantless search of the property, Shoemaker

27

told Plaintiff Brennan that Plaintiffs' prior arrest did not cover all the new units they have purchased, and they would be subject to arrest for the new units not covered by the first arrest. Brennan attempted to prevent that search, but the Searcy Police allowed it.  Because of this, Plaintiffs have had to post a sign on their property making it clear that Code Enforcement is not allowed without a warrant.

50.    The subject property has always been private property and has never been dedicated to a public use.  The property has never been opened to the general public but only to those with business on the property.  The drive is a privately-maintained drive which has never been dedicated to the city.  The property is served by only one drive, has only one entrance/exit, and is well screened off from the public street.  Nothing about the property indicates to a reasonable person that it is dedicated to a public use or otherwise open to the public.

51.    Any search on this private property which is not subject to one of the established exceptions to the warrant requirement must be conducted pursuant to a warrant.  Code Enforcement Officers do not have carte blanche to enter onto private property not dedicated to public use for the purpose of searching for evidence of ordinance violations.  As much as the city, in its quest for unlimited and unquestioned power, may not like it, this is still the United States of America, we still have a Constitution, and Citizens still have rights guaranteed by that Constitution.

V
CONCLUSION

52.    The actions of the city complained of herein have violated Plaintiffs' rights to both substantive and procedural due process as well as their rights to property and to be free from unreasonable searches and seizures.  Plaintiffs live under constant threat of custodial arrest for doing nothing more than using their property in a manner entirely consistent with its character,

28

history and prior treatment by the city and in compliance with the letter and the spirit of the Zoning Code. The behavior of the city has been arrogant, obdurate, arbitrary, capricious, at times childish, and always shamefully at odds with the principles upon which this country was established. The city has taken a position, at least toward Plaintiffs and likely toward the rest of its citizens, which can only be described as fascist. This is behavior one should expect from government officials under history's noted fascist regimes and not from city officials in a free country. In a free country, citizens should not have to live under the constant threat of custodial arrest on trumped up charges of fine-only violations because they have dared to differ with city employees and to insist on the free exercise of their property rights. The city's attempt to reestablish the ruler-subject relationship our ancestors fought to be free from is unconscionable. The actions taken by Cleveland and Shoemaker were taken under orders and/or policy of the City of Searcy and are therefore actions of the city.

WHEREFORE,

Plaintiffs respectfully request this court grant the following relief:

(a)     A determination that the subject property was a mixed-use development/subdivision at the time of annexation, has been treated as such by the city since annexation, and is entitled to continue as a legal nonconforming use with its current lot sizes, setbacks, drives, drainage and water and sewer facilities;

(b)     A determination that the seven new units Plaintiffs have been prosecuted for are mobile homes under the city's definition;

(c)     An order directing the city to issue any requested construction permits for single-family residential units on established lots or sites on the subject property and further directing the city to honor all previous representations made to Plaintiffs regarding such construction;

29

(d)     An order directing the city to pay to Plaintiffs compensatory and punitive damages in the amount of $42,000,000.00 (42 million dollars);

(e)     All other and further relief as the court may find just and proper.

Plaintiffs request a jury trial.

Respectfully Submitted,

Shirley Curd
1200 Curd Drive
Searcy, AR 72143
501-279-2403
shirleycurd@gmail.com

David Brennan
1200 Curd Drive, #4
Searcy, AR 72143
501-388-5106
nrvsearcy@yahoo.com

## VERIFICATION

STATE OF ARKANSAS     )
                      )ss.
COUNTY OF WHITE       )

On this day personally appeared before me, the undersigned, a Notary Public within and for the County and State aforesaid, duly commissioned, qualified and acting, Shirley Curd and David Brennan, to me well known or satisfactorily proven, who stated and acknowledged that they executed he foregoing Complaint under penalty of perjury for the consideration, uses, and purposes therein mentioned and set forth.

WITNESS my hand and seal as such Notary Public this 31 day of August, 2016.

Rhonda Horn
Notary Public

My Commission Expires: 6/23/21

30

# EXHIBIT 1

B.    Upon receipt in proper form of the application referred to above, the Planning Commission shall set a public hearing date, time and place, within sixty (60) days of receipt of the Residential Planned Unit Development application.

C.    Notice of such public hearing shall be published at least once, not more than thirty (30) nor less than fifteen (15) days before the hearing, in one (1) or more newspapers in general circulation in the City of Searcy. The publication of the notice shall be the responsibility of the applicant.

V.    Findings of Fact

A.    Within sixty (60) days after the close of the public hearing on the proposed Residential Planned Unit Development Conditional Use Permit, the Planning Commission shall approve or deny the Conditional Use Permit.

B.    For the Planning Commission to approve the Conditional Use Permit, the Commission must determine:

1.    The establishment of a Residential Planned Unit Development will not be detrimental to or endanger the public health, safety, morals, comfort, or general welfare.

2.    The Residential Planned Unit Development will not be injurious to the use and enjoyment or impede the normal or orderly development and improvement of other property in the immediate vicinity for the purposes already permitted, nor substantially diminish or impair property values within the neighborhood.

3.    Adequate utilities, access roads, drainage, and/or other necessary facilities have been, are being, or will be provided.

4.    Adequate measures have been or will be taken to provide ingress and egress so designed as to minimize traffic congestion in the public streets.

## Planned Development (PD) (2007-11)

I.    General Description The purposes of this district are to promote flexibility and innovation in the design of large-scale developments and to encourage the use of vacant, in-fill parcels in the built up portion of the city. The zone also promotes open space in the project design. The Planned Development (PD) allows greater flexibility of design to achieve the goals stated above.

In concept, the PD is a combination of zoning designation and development plan. A detailed development plan is required for permitting. Development must follow the development plan exactly. Failure in this respect will result in reversion of the property to the original zoning. Although design innovation is encouraged, and flexibility is allowed, the PD may not be used simply as a method of avoiding zoning regulations. The Planning Commission shall consider a PD proposal only if it meets one of the following threshold criteria.

Note  This document is a compilation of the official Zoning Code and all Ordinances amending said Code through Ordinance # 2009-35   All attempts have been made to strike out deleted parts of the code and append any additions to the Code   For official interpretations one should reference the original Code and any amending Ordinances

# EXHIBIT 2

## BEFORE THE PLANNING COMMISSION
## OF THE CITY OF SEARCY, ARKANSAS

**for public hearing on May 3, 2016**

Applicant:     Vernon L. and Maxine H. Curd Family Trust,
               Maxine H. Curd, Trustee
               1200 Curd Drive
               Searcy, AR 72143

Agent:         David Brennan
               Manager
               Curd Trailer & RV Park

## APPLICATION FOR DETERMINATION AS TO LEGAL NONCONFORMING USE

## ALTERNATIVELY FOR DETERMINATION AS TO USE NOT LISTED
## AND FOR CONDITIONAL USE

Comes now Applicant, Vernon L. and Maxine H. Curd Family Trust, Maxine H. Curd,

Trustee, pursuant to Chapter IV, Section VII and Chapter XVI, Section III of the City of Searcy

Zoning Code, and for her Application for Determination as to Legal Nonconforming Use,

Alternatively for Determination as to Use Not Listed and for Conditional Use, states:

Applicant is the owner of the property for which the Determination as to Legal

Nonconforming Use, Alternatively for Determination as to Use Not Listed and for Conditional

Use, is sought.

The address of the subject property is 1200 Curd Drive, Searcy, AR 72143.

The legal description of the subject property is:

A part of the West 15.00 acres of the Southwest Quarter (SW ¼) of the Northwest
Quarter (NW ¼) of Section 3, Township 7 North, Range 7 West, more particularly
described as follows: Beginning at a point 105 feet West of the Southeast Corner

1

of the West 15.00 acres of the SW ¼ of the NW ¼ and running North 840 feet;
thence South 68 degrees West 225 feet; thence South 505 feet to a point 115 feet
East and 260 feet North of the Southwest Corner of the SW ¼ of the NW ¼;
thence East 110 feet; thence South 260 feet; thence East 105 feet to the point of
beginning, containing 3.32 acres, more or less.

(This legal description includes what were, until merged via correction deed on April 11, 2016,

two contiguous parcels of land.  The certified list mentioned below references the two parcels.)

A list of the names and addresses of the owners of all properties within 200 feet of the

subject property as required by Chapter XVI, Section III(B)(4) of the City of Searcy Zoning

Code is attached to this application as Exhibit 1.

The following maps of the subject property have been attached to this application as

exhibits:

Exhibit 2:  a vicinity map to scale showing the subject property clearly outlined in a circle

with a radius of ¼ mile, as required by Chapter XVI, Section III(B)(5)(a) of the City of Searcy

Zoning Code.

Exhibit 3:  a satellite view of the subject property with property lines delineated.

Exhibit 4:  a satellite view of the subject property with topographic map overlay.

Exhibit 5:  a paper copy of the site layout of the subject property at a scale of one inch

equals 40 feet, showing building locations, parking, and the zoning of adjacent properties, as

required by Chapter XVI, Section III(B)(5)(b) of the City of Searcy Zoning Code.

## LEGAL NONCONFORMING USE

As the primary matter now brought before this Commission, Applicant requests this Commission determine that the subject property is a pre-existing legal nonconforming mixed-use development/subdivision entitled to legal continuance of use as a development/subdivision with established lot/site sizes, setbacks, yard areas, drives, drainage, and water and sewer systems. It is the position of Applicant that under the definitions of *development* and *subdivision* in the City of Searcy Zoning Code and the Subdivision Regulations the subject property was a development/subdivision in 1972 prior to its annexation and is therefore grandfathered in.

<u>**History and Circumstances**</u>

The subject property was originally laid out or platted into multiple lots or sites for multiple single-family detached dwellings in 1971 and saw principal construction in 1971-1972, when it began to be populated primarily but not exclusively by mobile homes. No plat map was filed with the County, as plat maps are filed when one parcel is divided into two or more separate parcels for resale and are not required or filed when the property being developed into building sites is not to be sold and will continue under one ownership as an intact parcel and a single entity. Not all sites were originally used for building construction or mobile homes, though some were used for each, and some sites were added later. Any sites added after annexation were done so in accordance with the City's policy on continuation of nonconforming uses and with knowledge and permission of City staff. No streets or drives have ever been dedicated to the City, and the drives have always been privately maintained by the property owners. The surface of the drives consists of gravel in the form of 2" single pass and, in areas, 3/4" minus over a packed roadbed of dirt and SB2 and holds up extremely well to normal use and weather. The

3

Case 4:16-cv-00632-BRW   Document 1   Filed 08/31/16   Page 37 of 82

property is serviced by a privately constructed water system constructed in 1971-1972 and consisting of a looped 2" PVC main line and 3/4" PVC branch lines.  It was connected to the City water system in approximately 1980.  The property is served by a privately-constructed sewer system constructed in 1971-1972 and consisting of 4" trunk and branch lines.  It was connected to the City sewer system in approximately 1999 via an 8" line, with the sewer system meeting all requirements in place at the time.  Neither the water or sewer system on the property have ever been dedicated to the city, and they always have been and continue to be privately owned and maintained.  There have never been any problems with the water or sewer systems not attributable directly to intentional acts by disgruntled tenants.  The proposed use would result in *less and not more* demand on the water and sewer systems which have served the property well for 44 years.  Every site on the subject property has electricity, land line phone, and cable TV connectivity, and the majority of the sites have natural gas connectivity.

The subject property is currently populated by single-family detached dwellings, mobile homes, and recreational vehicles used as residences.  A mobile home and RV park known as Curd Trailer Park has been operated on the subject property since before it was annexed into the City.  Applicant plans to transition away from mobile homes and toward efficiency and small home type rental units, which are much better constructed and much more attractive than the aging mobile homes and RVs currently populating the property *without diminishing* the established lot/site sizes, setbacks, yard areas, drives, drainage, and water and sewer systems.

## Reasons for Determining Subject Property a Legal Nonconforming Mixed-Use Development/Subdivision

It has been and remains the position of Applicant that the subject property, having been laid out or platted and indeed substantially constructed into multiple lots or sites prior to

4

annexation into the City, is a pre-existing mixed-use development/subdivision (with

nonconforming lot/site sizes) which saw population primarily *but not exclusively* by mobile

homes.  It is completely in the spirit of the Zoning Code that the subject property be determined

to be a property that existed as a mixed-use development/subdivision at the time it was annexed

into the City and allowed to continue as such with established site sizes, setbacks, yard areas,

drives, drainage, and water and sewer systems.

> The City of Searcy Zoning Code defines *development* as:

> The division of a parcel of land into two or more parcels; the construction, reconstruction, conversion, structural alteration, relocation or enlargement of any structure; any mining, excavation, landfill, or land disturbance, and any use or extension of the use of land.

> Under this definition, the subject property was unquestionably a development *before* it

was annexed into the City.  The Subdivision Regulations of the City of Searcy define

*subdivision*, subject to certain exceptions which do not pertain to the subject property at the time

of annexation, as:

> A subdivision shall include all divisions of a tract or parcel of land into two or more lots, building sites, or other divisions for the purpose, whether immediate or future, of sale or building development and shall include all divisions of land involving the dedication of a *new* street or a change in existing streets …

> Under this definition, the subject property was clearly already a subdivision at the time it

was annexed.  The property was laid out and substantially constructed into multiple lots, building

sites, or other divisions for the purpose of building development.  Some lots or sites saw building

development (single-family efficiency, workshop with living quarters) while others saw use as

mobile home spaces.  It should be noted that nothing in the definition of development or

subdivision requires the filing of a plat map with the Circuit Clerk.  Though a mobile home park

5

has operated on the property since before its annexation, this has not been the exclusive use of the property, which hosts both single-family detached dwellings and mobile homes / RVs.

Additionally, there is nothing in the Zoning Code or Subdivision Regulations which mandate that a property can be *either* a development/subdivision *or* a mobile home park *but not* both. The subject property clearly meets the definitions for a mobile home park as well as those for development and subdivision. As a development/subdivision predating annexation into the City, the subject property is grandfathered in and is entitled to continuance of use as such and should be allowed to transition from its historically mixed-use character to efficiency and small home type detached single family rental units, completely eliminating the mobile homes and RVs without further development requirements or being subject to the Subdivision Regulations. If the subject property is not determined to be a pre-existing nonconforming mixed-use development/subdivision and allowed legal continuance of use as such, Applicant alternatively requests this Commission make a determination that the proposed use is a conditional use and grant said conditional use.

## DESCRIPTION AND PLAN OF THE PROPOSED USE

## (Efficiency and Small Home Rental Community)

### Description of the Property

The subject property is an aging mobile home and RV park.  The property was laid out or platted into multiple lots or sites intended for single-family dwellings in 1971 and substantially constructed into such lots or sites in 1971-1972, prior to its annexation, when it first saw use primarily but not exclusively as a mobile home park.  The property is located at the South base of Backbone Ridge approximately ¼ mile West of Maple Street and is accessed via Holmes Road in the 900 block.  It slopes generally South-Southeast with greater slopes at the Northern end of the property, and consists of 13 terraced and 20 non-terraced sites.  Nominal gross lot size for the 15 upper lots and lot 2 is 38' x 107'6" or 4,085 sq. ft.  Lots 1 and 3 are roughly 80% and 65% of this size, respectively.  The average nominal size of the remaining lots is 86' x 20' or 1720 sq. ft.The property is served by a primary gravel drive (Curd Drive) with a gravel spur drive. Approximately 80% of the sites are heavily shaded by large trees.  The subject property had until April 11, 2016, consisted of two contiguous parcels which were strips of land with a North-South orientation; however, those parcels were merged into one parcel via correction deed on April 11, 2016.

Eight sites are occupied by mobile homes owned and controlled by property management.  Two of those mobile homes have been taken out of service and are slated for demolition in the coming months, with one currently undergoing demolition.  The remainder of the sites are either occupied by tenants or vacant.

As the mobile homes age, and with changes in demand in the housing market, the amount

7

of rent that can be charged in relation to wages and cost of living decreases.  The mobile homes also become more difficult to maintain.  As a consequence of these forces, it becomes more and more expensive to maintain the property, and needed maintenance will necessarily be left undone.  Also as a consequence of that, management must rent to lower and lower income tenants.  With this, unfortunately, comes a steadily increasing problem with drugs and other crime.  It is an inevitable downward spiral.   To reverse this downward spiral, Applicant seeks to transition the subject property entirely, over a period of 10 years *or less* to an efficiency and small home rental community, with one site dedicated to open space with a small garden and picnic tables.

The units to be constructed and rented will consist of a mixture of single-story efficiency units of from 200 sq. ft. to 360 sq. ft., single-story small home units of from 380 to 440 sq. ft, and two-story small home units of from 460 to 720 sq. ft.  There will be a mixture of partially pre-built portable units and site-built units and will range in design style from salt box to ranch to barn to arched cabin.  Photos of each design style can be seen below.  Units seen in the photos may be either smaller or larger in size than those proposed to be located on the subject property and may have options or features which will not be present on the units proposed to be located on the subject property or lack options or features which will be present on the proposed units.



Salt Box Style                                    2-story Ranch Style

2-story Barn Style                                Arched Cabin Style

The result will be an eclectic and vibrant mixture of sizes and styles of affordable, moderate-income workforce, young graduate, and senior housing.

Each unit will be anchored to a concrete footing and meet or exceed the requirements of the International Building Code for framing, entry doors, egress windows, and insulation and will be plumbed and wired according to code as well. Even the 200 sq. ft. efficiency units will meet 2012 International Residential Code Section R304 (minimum room areas), Section R305 (ceiling height), Section R306 (sanitation), and Section R307 (toilet, bath, and shower spaces).

9

In essence, the units will have the same construction standards as any other house. They will just be smaller – and stronger. Inherent in the design of the arched cabins, which have a metal frame, is a high degree of rigidity and storm survivability. The rigidity and storm survivability of the other styles of units will be enhanced by adding 7/16" oriented strand board to the interior of the wall and ceiling framing. Oriented strand board (OSB) is known for its exceptional shear strength and will greatly increase the storm survivability of the units over the existing mobile homes that populate the subject property. In fact, the units will far exceed the wind design criteria of the 2012 International Residential Code.

The units will be painted modern, vibrant colors, and where a new unit does not have a yard with a healthy, established lawn, the yard will be densely seeded with a mixture of Zoysia, St. Augustine, and Fescue, creating a lawn with acceptable shade, drought, and traffic tolerances. Concrete parking exists for the sites now used as mobile home spaces, and gravel parking exists for the sites now used as RV spaces. This parking and the gravel drives will be maintained as-is, with repairs being made as necessary. The existing drainage system is adequate to handle surface and ground water from average rainfall and will be maintained/repaired as needed.

The property is served by City water and sewer services, Entergy (Electric), CenterPoint Energy (Natural Gas), AT&T land line phone service, and White County Cable. The existing pre-annexation sewer and improvements that were made for connection to the City sewer system serve the needs of the property more than adequately, as does the existing water service connected to the City water system. The Water and Sewer needs of the property would not increase and would in fact decrease with the proposed conditional use. All utilities are available at all sites with the exception that natural gas service is not available at any site now used as an

10

RV space.  However, all proposed units will be all-electric.

The density of the property will not be altered, as units will only be constructed on pre-existing sites now used as mobile home and RV spaces *one per site*.  The open space on the property will increase, as the planned units will have smaller footprints than the existing mobile homes., and one site will be dedicated to open space.  The 12 sites now used as RV spaces will contain single-story efficiency units ranging from 200 sq. ft. to 360 sq. ft.  The 18 sites now used as mobile home spaces will contain a mix of single-story and 2-story small homes ranging from 400 sq. ft. to 720 sq. ft.  Within the first year, three two-story small homes, one one-story small home, and two one-story efficiency homes will be added to the property.  Within the first year, at least two mobile homes which have been removed from service will be removed or dismantled.  Thereafter, at least two pre-existing sites now used as mobile home or RV spaces will be converted to efficiency or small home rental use for one unit per space.  Each unit on a lot any side of which runs with the parent property line will have a minimum setback from the parent property line of 10 feet.  However, units on lots 5-19 will have a setback of 20 feet.

A minimum of 80% of the units will be rented "all-inclusive" with all furniture, appliances, cookware, dishes, and electronics included and all utilities paid, including basic cable and high-speed Internet.  (The tenant only need bring their clothes and personal effects.)  These would function very well as young graduate housing as well as senior housing and re-establishment housing for persons who find themselves starting over in life for one reason or another.  The unfurnished units with no utilities paid will serve well as workforce housing.

Exceptions to conventional yard sizes *may* be required; however, the conditional use sought will result in every case in yard sizes equal to or larger than the present yard sizes given

11

the smaller footprints of the proposed dwelling units. It should be noted that the subject property is zoned R3 Single-Family Residential, which zone has no minimum structure size requirement; however, as previously stated, all units will meet the room space requirements of the 2012 International Residential Code. An exception to the limit of one principal structure on a residential lot *may be* required for this conditional use if the property is not determined to be a preexisting nonconforming property (mixed-use subdivision) or if the proposed use is not, in the alternative, determined to be a combination or recombination of parts of a previously platted property. Given that there will be only one unit for any existing site now used as a mobile home or RV space, the exception would result in no material change in property use, save the increased quality and far better appearance and utility of the dwellings.

**Transition Schedule**

Applicant plans to transition entirely to efficiency and small home rental units at one per existing lot/site according generally to the following schedule.

| Summer 2016 : | lot 9 set aside for open space / community garden |
| | 16x16 two-story barn style unit on lot 2 |
| | 16x20 two-story barn style unit on lot 8 |
| | 16x24 two-story barn style unit on lot 10 |
| | 10x20 one-story salt box style unit on lot K |
| Fall 2016: | 16x20 one-story ranch style unit on lot 5 |
| Summer 2017: | 10x20 one-story barn style unit on lot H |
| | 10x24 one-story ranch style unit on lot D |
| Summer 2018: | 16x20 two-story barn style unit on lot 7 |

12

10x20 salt box style unit on lot G

Summer 2019:     10x24 one-story arched cabin style unit on lot J

10x20 one-story barn style unit on lot E

10x20 one-storysalt box style unit on lot F

Summer 2020:     16x16 two-story ranch style unit on lot 3

16x24 two-story barn style unit on lot 1

Summer 2021:     16x30 one-story arched cabin style unit on lot 11

16x24 one-story arched cabin style unit on lot 14

Summer 2022:     16x24 two-story ranch style unit on lot 15

16x16 two-story barn style unit on lot 6

Summer 2023:     10x20 one-story barn style unit on lot A

10x20 one-story salt box style unit on lot B

16x16 two-story barn style unit on lot 16

Summer 2024:     10x24 one-story arched cabin style unit on lot C

10x30 one-story arched cabin style unit on lot 1

Summer 2025:     16x16 two-story barn style unit on lot 17

16x30 one-story arched cabin style unit on lot 19

16x16 two-story ranch style on lot 13

Summer 2026:     16x24 two-story ranch style unit on lot 18

16x30 one-story arched cabin style unit on lot 12

This is a general plan which may be accelerated or altered; however, the transition will in no case be completed later than 2026.

13

**REASONS FOR DETERMINING THE USE SOUGHT TO BE A CONDITIONAL USE FOR THE SUBJECT PROPERTY**

The proposed use shares characteristics with the Planned Unit Development (PUD), which is a listed conditional use for R3 Single-Family Residential districts. It involves the use of the lots or sites now existing on the property for the construction of multiple single-family detached dwellings in a planned manner. The proposed conditional use also shares characteristics with with the Planned Development (PD), which allows for the clustering of dwelling units and their planned placement to take advantage of existing land features. It is not, however, a traditional conforming subdivision as the PUD and PD. It will for its life remain one entity on one parcel of privately-owned, privately-maintined land, with no city streets, curbs, drainage, etc.

The proposed conditional use is very similar to the current use of the subject property. The only difference is that, where the current use involves old mobile homes and RVs which will continue to age and fall into disrepair, the proposed conditional use involves modern, vibrant, safe, sound structures that will populate the subject property at the same density as the mobile homes and RVs at full property capacity. The only material difference is a very positive one.

14

## REASONS FOR GRANTING THE CONDITIONAL USE

The establishment, maintenance, and operation of the proposed conditional use will not be detrimental to or endanger the public health, safety, comfort, or general welfare. The use will, in fact, be beneficial to the public health, safety, comfort, and general welfare by transitioning an aging low-income property with its accompanying problems into a vibrant, modern, safe property with dwelling units much, much safer than the existing mobile homes given their modern code-compliant framing, plumbing, and wiring and their enhanced storm survivability.

The proposed conditional use will not be injurious to the use of other property in the immediate vicinity for the purposes already permitted, nor substantially diminish or impair property values within the neighborhood. There is nothing about transitioning an aging mobile home park to a modern, safe, efficiency and small home rental community that could possible be injurious to the use of other property for any permitted purpose. This transition would not be detrimental to property values; in fact, the vanishing of an aging mobile home park and the rise of an efficiency and small home community with enhanced dwelling construction would only be beneficial to surrounding property values. There is scarcely a more effective drag on property values than having an aging mobile park next door.

The establishment of the conditional use will not impede the normal or orderly development and improvement of the surrounding property for uses permitted in the district. If anything, the long-term continued existence of an old mobile home park would be more of an impediment to such development and improvement than would be the proposed conditional use.

The proposed land use is compatible with other area properties. The Fowler-Weed property to the West contains a small duplex, and the Country Meadows property to the South is

15

one of the largest apartment complexes in the city. There is nothing about the proposed conditional use that is any less compatible with other area properties than is the long-term continued existence of an old, declining mobile home park.

The proposed conditional use is in conformance with all off-street parking and loading requirements and ingress and egress, and pedestrian ways are adequate. This is a requirement apparently applicable to commercial/industrial zones and not residential areas; however, the parking in existence that will be maintained has always been more than adequate.

Landscaping and screening of the proposed conditional use will be in accordance with the City of Searcy Zoning Code. There will be no landscaping or screening changes. There is a cedar plank fence along the Eastern property line constructed by the then-owner of that property Any fences along any other property line, if they are ever to exist, will be built by the adjoining property owner, as neither Applicant nor Applicant's successors will not be building any fences.

Proposed conditional use signs shall be in accordance with the City of Searcy Zoning Code. There will be no signage other than an updating and maintenance of the existing sign, which has existed, subject to maintenance and repair, since prior to the annexation of the subject property.

Open spaces located on the proposed conditional use shall be maintained by the owner/developer of the subject property. The subject property will remain a private property, and its owner will remain responsible to its maintenance.

The size and shape of the site, including size, shape, and arrangement of proposed structures, is in accordance with the City of Searcy Zoning Code. This is especially true since the property was platted prior to its annexation and is therefore "grandfathered in."

16

There will be no increase, over current levels, of noxious or offensive emissions, including lighting, noise, glare, dust, and odor. The improved construction of the proposed dwellings will, in fact, more effectively prevent the emission of noise from within the dwellings than the mobile homes and RVs that currently populate the subject property do, and most units will be set back from the property lines more than the mobile homes currently are.

In addition, the proposed conditional use is in line with the City's Comprehensive Plan, which is attached as Exhibit 7, insofar as it addresses land use. The proposed conditional use furthers three of the land use objectives stated at page 3 of the Comprehensive Plan. It responds to an evolving housing need evidenced by the nationwide trend toward very small, very efficient dwellings, which is growing in popularity. It also provides workforce and young graduate housing. In addition, the proposed conditional use regenerates a property which is becoming blighted and will only become more blighted if it remains a mobile home park.

According to the Comprehensive Plan, the City should be responsive to trends in housing needs. Though those locked into traditional notions of what a habitable structure should be may have an immediate negative reaction to the mere mention of efficiency and small homes as detached singe-family dwellings for rental, it is inescapable that the trend toward low-impact, low-consumption living and very small and very efficient dwellings is nationwide and growing in popularity among certain segments of the population. This is evidenced by the increasing number of television programs, documentaries, and websites dedicated to so-called "tiny homes." The spirit of the Comprehensive Plan is that the City be responsive to this trend and its evolving housing need and be open-minded to creative ways of meeting the need. Unlike any other property in the City, the subject property is ideal for the exploration of housing geared

17

toward this growing market.  It is a low-traffic area which is very well screened off and virtually hidden from view.  Most people are surprised to find out there is a mobile home park there.  If the proposed conditional use were to be a failure, the impact would be minimal and almost invisible.  Even a failed efficiency and small home rental community would be less injurious to the surrounding properties and the City than would be a trailer park fallen into total blight.  In fact, it is hard to imagine a more negative impact on the surrounding property than the perpetuation of an aging and declining mobile home park.  Applicant and Applicant's successors have committed to and arranged for considerable and continuing debt-based investment in the subject property.  If circumstances require that the investment be made in mobile homes, the inevitable result is that, due to the low rent that can be obtained for mobile homes, the property will continue in decline.  It will, in time, become a scar on the landscape of the community as virtually every other mobile home park of size has done.  The choice is between exploring the future and the emerging trends in housing choices in the safest way possible in this city and remaining trapped in the past and in the draconian interpretation of a zoning code to be obtuse and unresponsive to change, thereby *guaranteeing* the eventual total blight of the property just like virtually every other mobile home park of size in and around the City.  The stated objective of being responsive to evolving housing needs would only be thwarted by the denial of the proposed conditional use, which denial would only perpetuate the existence of an aging and declining mobile home park.  Granting the proposed conditional use would better the subject property, the neighborhood, and the city in keeping with the Comprehensive Plan.

**Other Considerations**

Concerns have been raised about the proposed conditional use amounting to a *new*

18

subdivision and therefore being subject to the requirements of the Subdivision Regulations. As previously stated, it is the position of Applicant that, since the property was platted into multiple sites, two of which had principal structures on them, prior to the adoption of the current Zoning Code and prior to annexation into the City, the property qualifies as a pre-existing nonconforming property (mixed-use development/subdivision) not subject to the Subdivision Regulations. There is nothing about changing the nature or character of the structures on the sites that form the subject property that makes it a development or subdivision if it wasn't one when it was annexed. If it was a subdivision at the time of annexation, it is entitled to continuance of use, and whether the structures placed on the sites are mobile homes or modular or site-built homes is irrelevant. Not too long ago, a property was allowed to continue its nonconforming use as an exotic animal farm despite the fact that the numbers and types of animals has changed over the years. Similarly, all Applicant seeks to do is change the type of structures located on the individual sites of the subject property. Should it not be determined that the property is a nonconforming subdivision entitled to continuation in its present form, and should it not be determined that the proposed use is a use of a previously plated property exempt from the Subdivision Regulations an exemption from the Subdivision Regulations may be necessary.

19

## CONCLUSION

Searcy is a city that prides itself on progress. Progress is what this application is all about – progress from a declining mobile home park sure to become completely blighted to a modern, clean, safe, desirable living location populated by dwellings responsive to one of the most powerful housing trends this country has seen. Applicant has the ability, through financing recently obtained for this purpose, to make this transition, but only if the property is allowed to continue in its current form with current site sizes, setbacks, yard sizes, drives, drainage, and water and sewer systems. The money required to comply with all the requirements of a planned unit development or planned development and the Subdivision Regulations simply is not there, nor could it be expected to be there for such a small parcel of land. The property is too small to obtain the benefits of economies of scale. In order to recoup the engineering and construction costs of complying with the Subdivision Regulations, the rent on the units would have to be too high for the target market to support.

It would indeed be a shame if a city which prides itself on progress were, while having the best of intentions, to view the character of the subject property and interpret the Zoning Code and Subdivision Regulations with such draconian strictness, closed-mindedness, unresponsiveness, and lack of creativity as to *actually thwart progress* and *ensure the continued decline* of a property within its bounds, thereby harming the values of the properties around it and contributing to the decline of a neighborhood which by rights should be progressing. Instead, the subject property could and should become a model for small rental communities of this type and serving this growing market and housing need in cities around the State – a model of progress and creativity in land use. Denying the requests contained herein would work against

20

the stated goals of the Zoning Code and the City's nonconforming use policy as well as the Comprehensive Plan, while granting them would only further those goals. This is an opportunity to exercise creativity and to demonstrate responsiveness to evolving housing markets and needs. This is an opportunity to save a property from total blight and to save the neighborhood surrounding the property from the ill effects that would come with that blight. This is an opportunity to demonstrate an ability to dèpart from unthinking and robotic interpretations which bog some cities down and are not in the best interests of this city or the property owners within its bounds and in so doing secure the progress the City prides itself on.

WHEREFORE,

Applicant respectfully requests a determination that the subject property is a pre-existing mixed-use development/subdivision entitled to continuance of use and to transition completely to the proposed use; that, if the property is not to be viewed as a legally continuing nonconforming development/subdivision, this Commission grant the requested determination that the proposed use is indeed a conditional use for this property and grant the requested conditional use together with all necessary exceptions.

Respectfully Submitted,

_____

David Brennan
Agent for Vernon L. and Maxine H. Curd
Family Trust

21

# EXHIBIT 3



DAVID MORRIS
*Mayor*

JERRY MORRIS
*City Clerk/Treasurer*

BUCK C. GIBSON
*City Attorney*
(501) 268-4420

CITY OF *Searcy*
401 West Arch Avenue
SEARCY, AR 72143

Ph: (501) 268-2483
Fax: (501) 268-2104

April 27, 2016

Vernon L. and Maxine H. Curd Family Trust
Maxine H. Curd, Trustee
1200 Curd Drive
Searcy, AR 72143

RE:    Application for conditional use determination

An application for a request to place a conditional use determination before the Searcy Planning Commission at its regular meeting on May 3, 2016 has been made to the city by David Brennan as "agent for the owner." The city staff has made a careful review of this request, including a number of visual inspections of the site. Based on the review, we note the following:

1.    The request for a conditional use determination is made is for the re-use of a manufactured home park at 1200 Curd Drive, Searcy, AR 72143. The re-use would replace manufactured homes that are regulated under a code administered by the U.S. Department of Housing and Urban Development, with modular homes that are regulated by the Arkansas State Fire Code, adopted as the city's building code.

2.    The property in question is currently zoned R-3, Single-Family Residential. A manufactured home park is not a permitted or conditional use under the R-3 zoning. The park exists under the non-conforming use provisions of the Searcy Zoning Code. This is allowed because the park was a lawful use before the property became a part of the City of Searcy and was allowed to remain in operation, with certain limitations, as a nonconformity. As stated in the zoning ordinance, "It is the intent of his Code to permit these nonconformities to continue, but not to be encourage their survival."

3.    The proposed use of the property would appear from the known information, to be the continuance and similar use of a manufactured-in this case modular-home park.

4.    Each zoning district type in the zoning ordinance lists permitted uses and

conditional uses that are relevant to the intended nature of the district. The R-3 Zoning in the city's ordinance is set apart for single-family, low-density housing and makes no provisions for developments of the densities associated with a manufactured home park.

5.     A request can be made to the Planning Commission to "... determine whether a use not specifically listed as a permitted use or a conditional use in Commercial. Residential or Industrial Districts shall be deemed a permitted use or conditional use in one or more districts on the basis of similarity to uses specifically listed." The request, as submitted to the city, does not meet the standard of "similarity to uses specifically listed."

No application for the conditional use determination in question should have been submitted and no application for conditional use approval should have been initiated in absence of meeting the aforementioned standard. Reports from the city's Code Enforcement staff indicate that the purported agent for the property owner was advised not to spend money until the staff had time to consider the land use concept involved.

In light of the above. the request will not appear on the agenda of the Planning Commission at its meeting on May 3. 2016.

After reviewing the information provided, the code enforcement staff noted and reported a number of existing code violations within the existing park. Further communication concerning the future of this property will only deal with addressing these violations.

Very truly yours.

THE CITY OF SEARCY. ARKANSAS

By:

Buck C. Gibson, Searcy City Attorney

BCG/ac

Encl.

cc:     David Morris
        Mike Cleveland
        Steve Jordan
        Jim VonTungeln

S:\City of Searcy Departments Code Enforcement\Curd.2016-04-27 Curd ltr.wpd

# EXHIBIT 4

IN THE DISTRICT COURT OF THE CITY OF SEARCY

WHITE COUNTY, ARKANSAS

## AFFIDAVIT FOR WARRANT OF ARREST

STATE OF ARKANSAS                                    Police report #_____

COUNTY OF WHITE

CITY OF SEARCY

I, _Kenneth Shoemaker_ _Searcy Code Enforcement Officer_, do solemnly swear that _David Brennan Mgr. of Curd Trailer Park_ in said county of White did on or about the _8_ day of _June_, 20_16_ commit the offense of: _Chap 9 - Code of Ordinances_

(1) _Unsightly & Unsanitary Conditions_ _____ Bond:_____

(2) _____ Bond:_____

(3) _____ Bond:_____

The facts tending to establish the grounds for issuance of a Warrant of Arrest in this matter are as follows:

On 5-16-16 I recieved a complaint about a mobile home that had been torn down but not cleaned up, in the mobile home park. Apon inspection found this to be true, On lot 10 a mobile mobile home was torn down and all the debris on the ground. On 5-17-16 I maile a violation notice to the property owners address on file and advised them they had 7 days to clean property up. Mr. Brennan called and advised me, they were working on it and it would be cleaned up. I gave them an extension of time to get work completed. On 6-8-16, myself & Mike Cleveland went to do a re-inspection on the property. Trash and debris are still on lot 10 with debris still around property

And pray a warrant from the District Court of the City of Searcy, Arkansas, to apprehend and bring said

_David Brennan Manager of Clayd Trailer Park_

before said Court to be dealt with according to law.

Approved this ____ day of ____ 20__

_____
City of Searcy Prosecuting Attorney

DATE: _6/8/16_

_____
Signature of Affiant (1)

_____
Signature of Affiant (2)

Subscribed ... me this _8th_ day of _June_, 20_16_

_Amber Creameans_    Notary

WHITE COUNTY ARKANSAS

## AFFIDAVIT FOR WARRANT OF ARREST

STATE OF ARKANSAS
COUNTY OF WHITE                    Police report #_____
CITY OF SEARCY

I, _Kenneth Shoemaker_  _Searcy Code Enforcement Officer_ do solemnly swear that _Shirley Curd - Owner - of Curd Trailer Park_ in said county of White did on or about the _8_ day of _June_, 20_16_ commit the offense of _Chap 9 - Code of Ordinances_

(1) _Unsightly & Unsanitary Conditions_____ Bond _150_

(2) _____ Bond _____

(3) _____ Bond: _____

The facts tending to establish the grounds for issuance of a Warrant of Arrest in this matter are as follows:

On 5-16-16 I recieved a complaint about a mobile home that had been torn down but not cleaned up, in the mobile home park. Apon inspection found this to be true. On lot 10 a ~~mobile~~ mobile home was torn down and all the debris on the ground. On 5-17-16 I maile a violation notice to the property owners addres on file and advised them they had 7 days to clean property up. Mr. Brennen called and advised me, they were working on it and it would be cleaned up. I gave them an extension of time to get work completed. On 6-8-16, myself & Mike Cleveland went to do a re-inspection on the property. Trash and debris are still on Lot 10 with debris still around property

And pray a warrant from the District Court of the City of Searcy Arkansas, to apprehend and bring said _Shirley Curd - Owner - of Curd Trailer Park_

before said Court to be dealt with according to law.

DATE / _6/8/16_

Approved this ___ day of _Jun_ 20_16_            _(signature)_
                                        Signature of Affiant (1)

_____
City of Searcy Prosecuting Attorney.

                                        _____
                                        Signature of Affiant 2

Subscribed and sworn to before me this _8th_ day of _June_ 20 _16_

_Amber Creameans_   _Notary_

AMBER CREAMEANS
NOTARY PUBLIC
NO. 12382174
EXPIRES 05-10-202_
WHITE COUNTY - ARKANSAS

# EXHIBIT 5

Lot Width. The distance measured as a straight line between the points where the building setback line intersects the side lot lines, or, in the case of a corner lot where the building setback line intersects a side lot line and, when extended, the opposite street right of way line.

Marquee or Canopy. A roof-like structure of a permanent nature which projects from the wall of a building and overhangs a public way, and is designed and intended to protect pedestrians from adverse weather conditions.

Manufactured Home  A dwelling unit constructed an a factory in accordance with the federal standards, and meeting the definitions set forth the federal standards and under Arkansas Code 20-25-102. (2003-22)

Mobile Home. A single-family living unit designed for transportation after fabrication on streets and highways on its own wheels, or on flatbeds or other trailers, and arriving at the site where it is to be occupied as a living unit complete and ready for occupancy, except for main and incidental unpacking and assembly operations, located on jacks or permanent foundation, connected to utilities and erected in accordance with prevailing city laws.

A dwelling unit constructed in a factory before the enactment of the federal standards.

Mobile Home Park. A parcel of land upon which two (2) or more mobile homes are situated either free of charge or for revenue and shall include any building, structure, tent, vehicle, or enclosure used or intended for use as a part of the site.

Modular Home. Standardized units other than mobile homes as defined above which are manufactured elsewhere and assembled at the building site and which meet the Southern Building Code are acceptable in the residential districts.

Nonconforming Lot. A lot, the area, dimensions or locations of which was lawful prior to the adoption, revision, or amendment of the zoning code, but which fails by reason of such adoption, revision, or amendment to conform to the present requirements of the Zoning Code.

Nonconforming Structure. A lawful structure which exists upon the adoption or amendment of this Code that could not be built under the terms of this Code by reasons or restrictions on area, lot coverage, height, yards, or other characteristics of the structure, or its location on the lot.

Nonconforming Use. The use of any structure or land lawfully occupied and maintained as of the day immediately preceding the adoption of this Zoning Code, but which does not conform with the use regulations or required conditions for the district in which it is located by reason of adoption of this Code or amendments thereto.

Nursing Home, Rest Home, Convalescent Home. A private home for the care of children or aged or infirmed, or a place of rest for those suffering bodily disorders, but not including hospitals and sanitariums.

Off-Street Parking Space. A temporary storage area for a motor vehicle that is accessible to a street or alley and which is not located on a dedicated street right of way.

Offices. A room or group of rooms used for conducting the affairs of a business, profession, service, industry, or government.

- 10 -

# EXHIBIT 6



















# EXHIBIT 7



Taylor's Trailer Park





Taylor's Trailer Park





Taylor's Trailer Park















# EXHIBIT 8

# Searcy, Arkansas
# Comprehensive Plan





## INTRODUCTION

This document presents the adopted Comprehensive Plan for the City of Searcy, Arkansas. It replaces other adopted plans unless noted otherwise. Both the Searcy Planning Commission and The Searcy City Council have adopted the plan in accordance with applicable state laws.

### Purpose

The Comprehensive Plan sets out the official policy of the City regarding growth and development. It outlines the goals, strategies, and plans for development within the Searcy Planning Area.

The plan does not direct land use arrangement precisely nor is it a zoning ordinance. Rather, the plan serves as an instrument to blend public and private interests in a manner that will best serve the entire community. The plan does not obligate the City Council to expend funds but it does recommend projects that will carry out long-range goals.

The Planning Commission directed the preparation of the plan after careful study of the area. Areas of analysis included Searcy's history, topography, trends, utility capacity, transportation systems, financial condition, existing infrastructure, and surrounding land use. The planning process included public meetings, and the comments and ideas generated by the public are represented in this plan.

### Authority

The purpose of the Land Use Plan is consistent with the provisions of Arkansas, Codes, Annotated (ACA) §14-56-403. This section requires that plans of a municipality be "...prepared in order to promote, in accordance with present and future needs, the safety, morals, order, convenience, and general welfare of the citizens." The statutes further state that plans may provide for, among other things, the following:

- Efficiency and economy in the process of development
- The appropriate and best use of land
- Convenience of traffic and circulation of people and goods
- Safety from fire and other dangers
- Adequate light and air in the use and occupancy of buildings
- Healthful and convenient distribution of population
- Good civic design and arrangement
- Adequate public utilities and facilities
- Wise and efficient expenditure of funds

### The Planning Area

The Searcy Planning Area Boundary appears in graphic form on the plan map and other maps used with this document. The Planning Area Map was prepared in accordance with statutes found in the Arkansas Codes, Annotated § 14-56-413. A copy is on file with the City Clerk and the White County Recorder.

## CONTEXT

Cities do not function in either a physical or social vacuum. Any number of factors control the way a community can best meet the future. The following sections examine the most significant of these factors.

### History

The city of Searcy, Arkansas began as a small resort community called White Sulphur Springs, named for the natural springs nearby that have since run dry. The community was not officially named Searcy until November 23, 1837, many years after the first settlers moved there.

The city was named after a prominent figure in the state, Richard Searcy, who was appointed to the Superior Court of the Arkansas Territory by President James Monroe. Israel Moore was one of the first property owners in the city. He donated the area that is now Spring Park to the city for the free use of its citizens. He also surveyed the town and laid out its streets, naming them after those in old downtown Philadelphia where he once lived.

Two other towns were surveyed before Searcy, but neither developed. When White County was formed on October 23, 1835, eight months before Arkansas achieved statehood, there were no official cities or post offices in the area. After Searcy became the county seat it began to grow, but it was not until August 6, 1851 that Searcy was officially incorporated.

The original county seat of White County was Frankfort, but citizens petitioned for its relocation to Searcy and got their wish in 1840. The first county courthouse was located in Searcy in 1839, and at that time, there were fewer than 1,000 residents in the entire county. The current White County courthouse, constructed in 1871, sits in the same location as the original structure and is the oldest functioning courthouse in the state.

Schools and institutions of higher education were founded early on in Searcy. In 1849, a polytechnic school was formed in the city, and three years later, the Searcy Male Academy was established. A college for females, named Galloway College, opened in 1889, and was said to be the largest school for females in the South at one time. In 1930, Galloway College merged with Hendrix and Henderson-Brown College and closed soon after. Eventually, Harding University moved from its original location in Morrilton to the Galloway College site in Searcy.

As with most towns in Arkansas, Searcy struggled during the Civil War era, but many strong and determined citizens help the city succeed. One such citizen was General Dandridge McRae, a veteran of the Civil War who was eventually appointed Arkansas Deputy Secretary of State in 1881. Today there is an elementary school, athletic field, and street in Searcy and a nearby town named in his honor.

Before the Civil War, the major industry in White County was agriculture. By the turn of the century, this industry and others were booming in Searcy due greatly in part to the St. Louis Iron Mountain and Southern Railroad. In 1873, this railroad was completed to Little Rock, but it did not run through Searcy. The citizens of Searcy were so determined to reap the benefits of the railroad that they built the Searcy Branch Railroad to connect to the main line. At this time, there were three cities in Arkansas with the name Searcy, and the one in White County was the smallest. However, with the introduction of the railroad and other great advances, Searcy became the sole survivor.

In the 1880s, Searcy experienced a major housing boom. By the turn of the century, it had a population of about 2,000 citizens and a bank, cotton gin, planing mill, telegraph, fruit and vegetable canning factory, two steam grist mills, three newspapers, and

daily mail deliveries. The population of White County doubled in 20 years, from about 8,316 people in 1860 to 17,794 in 1880. By 1909, Arkansas was ranked fifth in the nation in lumber production, much of which came from White County. In 1929, the county was ranked fourth in the state for cotton production, and by 1920 Searcy was a leading producer of strawberries in the state. In 1932, Yarnell's Ice Cream Co., Arkansas' only independent ice cream company, was founded in Searcy.

## Regional Setting

- Searcy, the county seat of White County, is located along the Little Red River at the foothills of the Ozark Mountains near the Arkansas Delta region. The planning area forms a portion of the northeast/central section of the state, 50 miles northeast of Little Rock and 80 miles southwest of Jonesboro. Other area cities include Cabot, Heber Springs, Batesville, Beebe, and Newport. The map on this page indicates the approximate trade area of the city. This map indicates the positive position Searcy maintains in terms of sales tax revenue.



Searcy, Arkansas
Retail Trade Area

Searcy is served by US 67/167 highway running southwest to northeast through the planning area. This corridor connects the city to Interstate Highway 30 at Little Rock via four-lane controlled access roadways. The corridor is primary traffic way through northeast Arkansas and has been considered for inclusion into the Eisenhower Interstate Highway system.

Not only is Searcy connected by its roadways, the city airport links the city to the rest of the state and country. The Searcy Municipal Airport is in the southern portion of the city. The airport provides 6,008 feet of runway and features an instrument landing system. It is capable of accommodating jet service which may see increased demand with the advent of the natural gas industry in the region.

The Little Red River is located to the northeast of Searcy. The Little Red is a cold flowing stream that supports a world class trout fishery. While locally the river is not capable of supporting a viable trout habitat, it does provide an excellent recreational and scenic amenity.

Other factors contribute to the quality of life in Searcy. Harding University provides a classic college town atmosphere. In addition, the university has provided educational opportunities to Searcy residents since its formation, and its economic impact on the region is significant. Adding to this educational economic bonus is the presence of the Arkansas State University Campus in the north part of the city. The Walmart Distribution Center, Yarnell's Ice Cream, First Security Bancorp, and natural gas industries provide the city with even more jobs and revenue.

# TRENDS

Over the past 16 years, Searcy has experienced steady growth at a rate higher than both the county and the state. The city has enjoyed a growth rate of between 1.5 and 2.5 percent per year. This represents a steady, healthy rate which does not overload municipal systems with explosive demand. With the advent of the natural gas industry in north-central Arkansas, the city continues to grow and the future growth rate may exceed that of the past.

According to the 2000 census, the city had a relatively high percentage of residents with college degrees. The location of two institutions of higher learning helps account for this fact.

The housing stock is Searcy has diversified in recent years with a greater percentage of multi-family and rental units. However, as with most mature cities in the state, much of the housing stock in Searcy is old. Almost 70 percent of units are over 30 years old and 14.7 percent were built before 1940. As a result of a strong code enforcement program, very few have deteriorated to the point that they cannot be maintained in a livable condition.

Overall, Searcy is a growing and diversifying city with many unique resources. Its impressively high percentage of college graduates is coupled with a comparatively low percentage of high school dropouts  The city will need to work to increase affordable housing in the future considering the need to maintain the community as an attractive place for new homeowners as well as older citizens. Workforce housing will also be a priority for future planning efforts

In summary, existing trends are positive for the city despite the fact that this plan originated during a downturn in the national economy. White County's unemployment rate during the first four months of April 2009 mirrored that of the state of Arkansas. Both entities saw a slight decline in the unemployment rate while the national rate was rising. Sales tax revenues also continued to rise during this period.

# ISSUES

Although Searcy enjoys a stable and prosperous development pattern, it must address the same issues facing other cities of its size. It is important that land—although held in separate ownerships—develops in such a manner as to protect property values and protect the health, safety, and welfare of its citizens. It is also important that the transportation system allow efficient delivery of goods and services. Finally, the development of community facilities must keep up with the growth of the community. Coordination of these efforts represents a major function of this plan. The following sections treat these issues in more detail.

## Land Use

As the City of Searcy moves into the 21st Century, land use needs change from those that may have existed in the past. The city developed into its present state through its reliance upon traditional economic development engines and the fact that Searcy is a "university city." While these factors are still important, they now compete for attention from



Spring Park in the heart of the city.

other emerging forces such as the growth of the natural gas industry, encroachment of rural water districts, protection of environmentally sensitive areas, and the need for greater diversification of the housing market. A city must periodically reevaluate its development pressures and attempt to prepare for change whether the change is considered positive or negative.

Objectives

- To be responsive to need development needs of Searcy's growing economy
- To promote a healthy mix of commercial, residential, and industrial development
- To provide "workforce" and "young graduate" housing.
- To promote a healthy downtown that serves as central focus of the community
- To preserve the natural functions of environmentally sensitive areas
- To preserve areas important to the local cultural heritage
- To direct development toward areas where existing infrastructures can support it
- To create neighborhoods of choice
- To ensure a high quality of urban design along the city's signature gateways
- To promote infill development and regeneration of blighted areas.

## Transportation

Searcy is a city of corridors. These corridors connect the city's western and northern residential areas as well as downtown to U.S. 67/167—the region's primary traffic way. The corridors over time have served to provide areas valuable to commercial development as reliance on the automobile has increased. While providing great economic returns this development has served to diminished the functional capacity of these corridors, which has necessitated construction of a bypass around the north and western portions of the city. Furthermore, the dominance of the automobile creates an environment that makes pedestrian and bicycle transportation a challenge. Addressing issues concerning both automobile and alternative transportation forms is a priority of this plan.

Objectives

- To preserve the traffic-carrying capacity of the city's primary corridors
- To prevent over-development and poorly designed development along primary corridors with significant vacant land such as Beebe-Capps Expressway
- To provide for the use of alternative forms of transportation
- To provide viable east-west and north-south traffic routes for the movement of people, goods, and services.
- To coordinate transportation and land use decisions and forecasting
- To provide for new arterials where necessary
- To promote extension of the roadway system utilizing a grid pattern as well as alignment with existing roadways

## Community Facilities

A growing community such as Searcy is faced with many unique challenges. One of these is the provision of adequate community facilities. For Searcy these challenges will rest primarily in the realm of fire and police protection along with parks and recreational opportunities. The main fire and police stations should prove sufficient during the planning period. New facilities will be planned in such a manner as to maintain a level of serviced consistent with national standards.

Objectives

- To maintain the city's current ISO fire protection rating
- To provide adequate police protection for the community
- To ensure recreational opportunities are well distributed throughout the community
- To meet nationally recognized standards for the provision of park facilities
- To consider the provision of community facilities in any future development approvals
- To maximize the potential of all existing city parks
- To position Searcy as a major regional recreation center in north-central Arkansas
- To provide pedestrian and bicycle linkages to major community attractions
- To provide community facilities that will enhance or magnify the benefits of the community's assets such as Harding University



Downtown Commercial

## Housing

Searcy enjoyed a boom in new housing development during the last two decades. At the same time, a large percentage of the houses in the city are more than 70 years old. Thus housing efforts should include the gradual replacement of housing that deteriorates to the point at which repair becomes too costly to justify.

# GOALS

The following goals guide the creation of an action program for the preservation and improvement of community life within the Searcy Planning Area. The goals are long-range in nature and cannot be accomplished overnight. Their intent is to serve as both a guide and a method of measuring progress over time. Goals may change or be expanded over time, and as they are, they will be incorporated into the plan.

At the time of the adoption of the plan, the community development goals were as follows.

- Maintain an up-to-date community plan, along with supporting regulations that will promote the orderly growth and development of the Searcy Planning Area.
- Maintain plans and regulations in a format suitable for use by staff, public officials, and the general public.
- Preserve the historic nature of the city and its physical surroundings.
- Retain a Class II ISO Fire rating for the city.
- Support the development of unused property in the developed portions of the planning area and the redevelopment of property that creates a blighting influence on the community. Regulate development in such a manner as to protect the health, safety, and welfare of all residents within the planning area.
- Support development that will maintain safe streets and neighborhoods within the city.
- Partner with the private sector to create developments and neighborhoods within the city.
- Plan in advance for transportation and community facility improvements that will meet adopted standards for a growing population.
- Facilitate developments that will result in the growth of job and business opportunities.
- Support the efforts of quasi-public entities such as the Chamber of Commerce, SREDC, and Main Street Searcy.
- Expand transportation plans to accommodate pedestrian, bicycles, and public transit.
- Protect and improve the physical appearance of the city and its environs.
- Protect the downtown area as the physical core of the city and support developments that act as magnets for human activity in the area.
- Improve the physical relationships between the city and its major institutions.

# DEVELOPMENT PLAN

Included below are actionable steps that will be used to carry out the proposals in the comprehensive plan. The primary step towards implementing the Searcy Comprehensive Plan will be adoption by the City Council. Adoption will communicate to all stakeholders the city's commitment to Searcy's future and its policies for future development. The steps below will be used to implement and fulfill the goals of the comprehensive development plan. The city should take these steps and form a time line, budget, and overall plan of action for implementing the steps below.

In prioritizing the components of this work program, the city should adopt the following strategies:

- Address the city's basic needs first.
- Build upon the community's assets.
- Balance considerations of growth and community enhancement
- Employ a comprehensive, lateral viewpoint.
- Seek out opportunities for public-private partnerships.

The action items are broken up into the following three categories: land use, transportation, community facilities

## Land Use

- Review and revise existing zoning and subdivision codes into a unified development code.
- Promote higher development densities along planned infrastructure.
- Create overlay zoning districts along primary corridors.
- Ensure local rural water districts comply with state policies regarding the construction of water lines in the city's planning area.
- Work to eliminate barriers that might prevent the provision of "workforce" and "young graduate" housing.
- Continue to work with Main Street Searcy, SREDC, and the Chamber of Commerce in promoting Searcy's downtown and economic development.
- Adopt formal policies regarding development in environmentally sensitive areas such as floodplains and areas of steep topography.
- Encourage innovative development.

## Transportation

- Implement access management controls along arterial roadways including Beebe-Capps Expressway.
- Maintain an acceptable level of service along the city's primary corridors.
- Construct a bypass around the northern and western portions of



Downtown Mixed-Use

Searcy from Judsonia to Highway 13.
- Improve traffic flow on Benton, Elm, Gum Springs, Pioneer, Queensway, Poplar to ease traffic demands along Main St.
- Improve pedestrian and bicycle safety and access .
- Designate a pedestrian route from Harding University to Spring Park and from Spring Park north along Spring Street to the Courthouse Square and beyond.
- Provide pedestrian crossings from Park street across Main Street to Spring Park and from across Pleasure from the Library complex.

## Community Facilities

- Maintain and improve fire response times.
- Relocate Fire Station Two on the north side of East Moore Avenue between River Oaks Village and the Wilbur Mills Center.
- Construct a fire station near West Country Club.
- Construct a fire station near the intersection of the proposed bypass and Gum Springs Road.
- Construct a fire station near the Searcy Municipal Airport.
- Build adequate park facilities to serve the western portion of the city.
- Require subdivision development approvals to include considerations for park facilities.



Photo-enhancement of Mulberry Street Landscaping

- Acquire access for Riverside Park from Bypass Road.
- Fully develop all existing park facilities including the Searcy Sports Complex and Riverside Park to promote regional recreational opportunities.
- Study options for a new water-park facility or community center.
- Expand the trail system to the southern and western portions of the city.
- Explore opportunities with private organizations to provide hiking, mountain biking, and nature trails in the planning area.
- Assist in the development of a new library complex in the downtown area.

## Regulatory

Accomplishing the programs outlined in the preceding sections will require a number of refinements to the city's existing land use regulations. Also, there have been multiple revisions to the existing codes since their original adoption. To carry out the provisions of this plan, land use regulations will be combined into a single "unified" code.

In addition to the zoning and subdivision codes, the unified code will contain additional regulations governing such areas as drainage, stormwater management, and street construction standards. Other regulations that will be considered for the unified code include:

- Overlay district regulations for key corridors within the city.
- Optional form-based zoning regulations for large-scale or

innovative developments.
- Enterprise overlay districts for area designated as emerging business areas. These would be districts where normal regulations might be reduced in order to promote new business development.
- New regulations that will allow mixed-use developments.
- Enhanced residential life in and around the downtown area

## SUMMARY

No plan can foresee the future. Rather, plans simply envision potential impacts and set forth the means to accommodated those impacts. They must do so within the fiscal restraints imposed on the City Council and in a manner that will best protect the public health, safety, and welfare.

It is also important that the city move forward while retaining its positive aspects. For example, in 2009, the Searcy Fire Department received National Accreditation, one of only 28 fire departments in the world to do so. Positive accomplishments by this and the other fine departments of the city must be supported and maintained.

As new challenges face the city, the elements treated herein will be affected. When this occurs, the Planning Commission will amend this plan and forward the amended plan to the City Council for certification. The need for a community facility or new transportation link in the future shall not validate the plan nor the planning process. In this manner, the plan will become a living document that can evolve to meet changing circumstances.

## ACKNOWLEDGEMENTS

The following individuals participated in or support the development of this plan. In particular, the Mayor's Planning and Growth Committee worked diligently to prepare this plan and guide it through the approval process.

**City Council**
Belinda LaForce, Mayor
Dale English
Jim Dixon
Carl Nutter
Mary Ann Arnett
Jackie Liles
Mike Chalenburg
Dale Brewer
Steve Sterling

Buck Gibson, City Attorney
Peggy Meads, Clerk/Treasurer

**Planning Commission**
Steve Jordan, Chairman*
Jim Wilbourn, Secretary*
Charles Green
Denise Drye
Jim Baugh Jones
Gerald Joyner
Ronnie McFarland
Bill Patton
Mike Hutsell
Lillie Cook - Staff Liaison
* Also served on the Planning and
Growth Committee.

**Planning & Growth Committee**
Barry Hoffman, AIA
Richard Stafford, ASLA
Stuart Dalrymple
Paul Ford
Buck Layne
Frank McKenney
Burney Lightle, MAI
Phil Watkins, Fire Marshall
Clarence Buckner

**Department Heads**
Mark Lane, P.E., City Engineer
Mike Cleveland, Code Enforcement
Sam Watson, Streets
Joyce Turley, Library
Brian Smith, Parks and Recreation
Terry Rutherford, Sanitation
Philip Nilles, Airport
Kyle Osborne, Police Chief
Bill Baldridge, Fire Chief
David Sawyers, IT
Linda Maddox, Courts

Consultants: Urban Planning
Associates, Inc.
Jim von Tungeln, AICP, Planner
James Walden, Planner



Little Rock, AR
Phone: 501-372-3232
www.planyourcity.com

# www.Searcy.com